And counsel, I noticed that you were coming in the courtroom literally as we passed your case. There's no need to make any kind of apologies or not. We know you were here. Thank you, Judge. I appreciate that very much. I thought there were two cases you were going to make. I used the facilities very quickly. I appreciate that. I was mortified to use that great 18th century word. Don't worry about it. Don't worry about it at all. Thank you. I very much appreciate your understanding. Your Honors, may it please the Court, I'm Robert G. Ryan for the Petitioners. I guess you can just say, lo-long, lo-long, lo-long. Yes, Your Honor. Indeed, we can. Are all Chinese, Christian, female Indonesians entitled to asylum in the United States? Judge Kleinfeld, I believe there has to be perhaps some showing of particularized risk. Lo-long is Lo-long, she was a student in the U.S. It's very broad. I don't think she's even been back there much except for vacation trips, has she? I guess I'm answering this question very conservatively in the sense that lo-long would seem to indicate that one could simply be a member of those particular disfavored subgroups and receive asylum. An immigration specialist could simply hang out a sign saying, I represent only Chinese Christian women from Indonesia and make a heck of a living. Well, Judge Hawkins, I think that one could draw the conclusion from that particular decision. We do have evidence here, personal experiences that do go to the protected grounds of ethnicity. In the absence of the lo-long case, though, would we be obliged to conclude that what was so bad that it rose to the level of persecution? Isn't it really lo-long that tips the balance? And only that. Well, first of all, Judge Graber, the argument we're making here is that past persecution I can't concentrate because of that cell phone. Whoever has it, please leave the courtroom. Don't just turn it off. Leave. Thank you. We believe there's past persecution in this case, Judge Graber. But even if there isn't past persecution under sale, a well-founded fear of future persecution without past persecution, because there was no finding of past persecution in that case, would be enough to establish asylum. Because of the future persecution question. That's correct, Your Honor, just on that particular point. One can show past persecution, that then shifts the burden to the government to show that conditions are not so dangerous now that the person could return safely to Indonesia. But we don't need, and in most cases go out, I'd say at least 90% of all asylum cases go out on a well-founded fear of future persecution without a finding of past persecution. We think there is past persecution in this case, but certainly the immigration judge in this case, the BIA, could certainly find from the evidence in this case that she's established a well-founded fear of future persecution without any finding of past persecution. But we believe there's past persecution in this case. Let's see, what you've got here, as I remember, is seven years ago, the non-Chinese Indonesians threw rocks at the building where the shop is and broke windows. There's a nasty history of the native Indonesians attacking the people of Chinese descent there. And the husband, six years ago, got robbed or beaten three times. Is there any more? Yes, Your Honor, there is. She testified and said in a declaration that she and her co-petitioner husband live with her in-laws above the family store in Jakarta, and the native Indonesians engaged in repeated acts of shoplifting. Shoplifting. Shoplifting. Shoplifting. And if a family member... They killed them, right? Yes. When they confronted. Correct, Judge Graves. I was just getting to that. And if a family member would try to confront them, the suspect would, quote, threaten us, this is from her testimony, threaten us and say they kill us, verbatim, quote. That's Administrative Record 100. Your Honor, there's some feeling among Koreans in Los Angeles that as some groups of customers treat them like that, the difference would be that the authorities do not condone it. Was there evidence that the authorities condone this mistreatment of Christians? Well, Your Honor, at a minimum, there is compelling evidence in the record that the authorities, even if they were willing, are unable to protect the ethnic Chinese. If I may just go back for one moment to this question of continuing problems that she had until the time she left. This is going back to the shoplifting incidents. When she was asked, did the native Indonesians ever stop shoplifting in the store before you left Indonesia, she replied, no, they didn't. Administrative Record 100 to 101. Now with respect to protecting the Chinese, Your Honor, the authorities haven't prosecuted anyone for the anti-Chinese May 1998 riots. That speaks volumes, we believe, with respect to whether the authorities are willing to protect them. Now with respect to religious violence, the country report stated, the 2000 country report stated that religious violence, and I'm quoting now, religious violence and the lack of an effective government response to punish perpetrators and prevent further attacks led to allegations that officials were complicit in some of the incidents, or at a minimum, allowed them to So there's overwhelming evidence in the record that the authorities aren't going to protect the Chinese. There is official state-sanctioned discrimination against the ethnic Chinese, which we ask this court to condemn. Some of it is just the affirmative action plan for the native Indonesians, like assuring that they get a certain number of spots in the universities, that sort of thing. Well, Your Honor, we think it goes beyond that. It goes to their having to get certain documents, which are then used by the authorities to, in essence, identify them as ethnic Chinese, and then what happens is they shake them down for more money. What I'm trying to find out about is, if we leave Lo Long out of the picture, the mandate has not issued. It's still subject to a possible en banc call. If we leave Lo Long out, what moves this up from a well-founded fear of discrimination, which does not provide for asylum, and is almost certainly well-founded, to a well-founded fear of persecution, which does entitle a person to asylum? Well, Your Honor, Chinese Christians are going to get discriminated against there, whether they're going to get persecuted there, that's a different question. Well, simply, we believe this case can be easily decided under SAIL. SAIL said that if one can show that the country conditions are so bad that one is then a member of a disabled group, and she is, she's ethnic Chinese, that's undisputed, then the standard in SAIL is that one only has to show a comparatively low level of individualized risk. We believe on this record that she can meet that test, and SAIL was our case. I briefed it and argued it, and the petition for re-hearing has been denied, was denied on March 7th of this year. So that's a final decision, and that's, with all due respect, the controlling authority in this court. There's more than ample evidence with respect to her personal experiences, we believe, under SAIL. Well, I want to save that minute. Yes, I would, Your Honor. Thank you very much. Thank you, counsel. Counsel, whether we think it's correctly decided or incorrectly decided, at the moment everything is materially different about this case that would permit us or require us to reach a different result. First, I'd like to say we're still considering whether we're going to seek further judicial review of Lo Long. I do recognize that. Oh, you think maybe your agency will be happy with Lo Long and it won't petition for re-hearing? Well, the Solicitor General is still considering it, and we did seek an extension for the, to file a re-hearing. First, I'd like to say that Lo Long is significantly different in this case, well, for a couple reasons. First of all, the court's review is a record review, so to the extent that this court's going to consider things that were not in this record, expert testimony or whatever, that were in Lo Long, the board didn't have a chance to look at that stuff because Lo Long's decision. So therefore, if the court's going to rest its finding on those factual things, it should remand to the board to allow the board a chance to look at those. I'm not sure I understand that answer. The big difference between this case and Lo Long was that that, there was expert testimony there, and there wasn't here. Basically the same documentary evidence is there, but not the expert explaining its meaning. But once there's a holding in that case that is broader than the individual situation, that makes a holding about a period of time and a location, I guess I'm not sure how we, how we unravel that. Well, let me go on to address the factual differences that I see between the two cases. My comment about remanding if you're going to rest on the facts and expert testimony in Lo Long is one thing. Also, there's a factual differences between this case and Lo Long. And first of all, I'd like to say that we don't understand Lo Long to say that just because you're Indonesian, Chinese, Christian, female, that you're automatically entitled to asylum just because you're a member of each of those groups. Whether you agree with Lo Long or not, you'll have to agree that the facts in this case are certainly stronger in terms of claim of past persecution. We don't believe past persecution has been shown in this case. No, I didn't ask you to concede whether it had been or not. Would you concede that the facts surrounding the Petitioner in Lo Long are less egregious than the facts described by the Petitioner in this case? No, not necessarily. No? In this case, at least the woman was there. In Lo Long, she was in the United States as a happy student. Okay, she was there, but with the things that turned Lo Long, the additional particularized things that the Court looked at were a uncle that was severely beaten and required surgery to his face in order to fix his face. In this case, there was only some offensive touching, some shoplifting on three occasions. And death threats from shoplifters. Well, the death threats only came once they decided that, you know, once they said, well, you know, we're going to report you to the police. Then the death threats came. I'm not sure. And there was no indication that any statements or anything that they were shoplifting because they were Chinese or the death threats were because they were Chinese. So there's also an anaconda problem there in addition to not rising to the level of persecution. With regard to the husband who was stopped apparently three times in May, June of 1998 while trying to make deliveries, the first incident he was stopped, they asked him for money and he refused, said he didn't have any, and so they slapped him. That does not rise to the level of persecution. The second incident, he didn't have any money when they asked him and he was hit in the face. He went to the hospital, but all he got was a tetanus shot and a bandage. That is not to the same severity as in Lo Long. And the third incident, they just stole items from his truck. That does not rise to the level of persecution. The country report, which was in evidence, indicates that there is continuing and ongoing acts of violence against ethnic Chinese and ethnic Chinese who are Christian in Indonesia, doesn't it? The country report shows that there is continuing violence against Christians. Obviously, some of those are Chinese, as well as there is basically fighting between the Muslims and the Christians and other religious groups. With regard to violence against Chinese Indonesians, the 2000 country report, which was published in February 2001, showed that the level of violence dropped sharply since mid-1998. But that was the very same report that was looked at in Lo Long, the 2000 report, wasn't it? I think it was the 1999 one. Well, you may be right. All right. Also, with regards to the – in Lo Long, they looked at the family members. And I think that that's a big difference here. In Lo Long, they said, well, the family members who weren't harmed, they said, well, they weren't similarly situated because she had a friend who was of the same age in her – around 20 who was raped. In this case, the lead petitioner is in her 30s or 40s – late 30s or 40s. And so she has siblings that lived in – that continue to live in Indonesia who have not been harmed. And in addition, she lived there with her family for two-and-a-half years after the 1998 riots and stopping of her husband with the trucks. That was the last incidents – big incidents, if you can call them big. And nothing happened to them for two-and-a-half years. To her family, all of her – you know, seven siblings still living there, and there are more than 20 children that live there. And in addition, the in-laws that had the shop that were subject to the 1998 riots, where they were stoned – the windows were stoned – they continue to have their shop there. And there is no indication in the record that there have been any further incidents that they've been subjected to. So I think – Could you tell me how HCFR 208.13b23 works? That's that section where some minority group faces persecution in a country without the need for an individualized basis. Right. Well, my understanding of how this works is that if you show a individualized – individual – well, let me back up. If you don't show a pattern in practice of persecution of a group that you're a member of, then – then if you show a pattern in practice, then you don't have to provide evidence that he would be – that the individual would be singled out individually for persecution. So – but if you don't show a pattern in practice, then you do, under the regulation, have to show that the person would be individually singled out. Now, we don't think – So let me understand your position. Your position is that there is no middle ground. You either show a pattern or practice. You show that you – you know, we're a university professor in Cambodia. Or if you don't meet that level, then it's an individualized determination and there's kind of no halfway. Our understanding is that you still have to show out that you would be – show that you would be singled out. Now, I guess this Court has held that – and I think there's a – I think there's a – and I haven't cited it. I don't think it's in the brief, so you may not want me to say this. I think it's a Third Circuit case called Lee that disagrees with this Court. But I recognize that this Court – Probably the first time that's ever happened. Right. And so they don't – they don't agree with the disfavored group analysis that this Court has adopted. Let me say in seriousness, if you'd like us to consider the logic or whatever – it's not foreign law, so we probably won't get in trouble with Congress. If you'd like us to consider it, you can either submit a post-argument letter or give the citation to the clerk and there's a sheet you can do it on. Okay. So I see my time has expired. I would just emphasize that we don't believe that even under Lalong and Sale that the – there's no past persecution here. They haven't showed a pattern of practice of persecution. And that even under a disfavored group analysis, it doesn't rise to the level of Lalong or Sale based on the facts and the mitigating factors of the family continuing to live there and their having lived there for two and a half years with nothing happening to them. And I don't believe that evidence compels a different finding than that of the immigration judge. Thank you. Thank you, counsel. Your Honor, sir, I would like to point out that the family is here today. The second to the back row to my right. And their pastor is here today as well. Thank you. We heard their cell phone. Oh, my goodness. Sorry. I didn't know it was there. With respect to the shop, during the May 1998 riots, the record shows that the Native Indonesian rioters shouted, destroy the Chinese, destroy the store. Administrative record 98, they knew it was a Chinese store. And they repeatedly went in there and shoplifted. And there were threats that were made repeatedly. And that happened until she left. So the idea that something happened two and a half years before they left, that just is not square with the record. With respect to his injury, when he was struck on the nose, he bled. He went to the hospital. He sought medical treatment. And that's physical violence. With respect to pattern of practice, we think that the court should consider the fact that the derivative beneficiaries here suffered the various persecutions that they did. And that ought to be considered with respect to pattern of practice evidence in this case. Thank you, Counsel. Thank you, Judge. Sumiati v. Gonzalez is submitted, and we are adjourned.
judges: Kleinfeld, Hawkins, Graber